CaRuthers, J.,
delivered the opinion of the Court.
This suit was brought and a recovery had upon, a bill of exchange held by the plaintiff below as a corporation against the defendant. Several questions are made in defence: 1. That the charter was fraudulently obtained. 2. The act was passed without taking the ayes and noes on the last reading. 3. That it was repealed by the Legislature at its last session and before the trial of this suit, and therefore no recovery could be had, as the corporation was dissolved.
On the first point, it is urged that some one or more members of the . Legislature of 1853-4, whose names are not given, offered sections 68 to 75, as amendments to an act, entitled an act, “to incorporate the iEtna Mining and Manufacturing Company and for other purposes,” incorporating this and another company for Mining and Manufacturing purposes, which *623 sections after enumerating the ordinary powers of a corporation, has the following enlarging and amplifying clause, that whenever the said companies are “organized according to the provisions of the foregoing sections, in addition to the powers therein enumerated, they shall have all the powers, franchises, rights, privileges and immunities conferred upon the corporation and body politic created by an act passed December 27, 1843, ch. 60.” By reference to the act of 1843, ch. 60, it' is found to be, “ An act to charter the Bank of East Tennessee.” The argument is, that these sections were designed and fraudulently offered in the hurry of legislation, and on the third reading of the bill, and that they were voted for by a majority, without reference to the act of 1843, and without knowing that they were creating two new banks. There are some insurmountable obstacles to arriving at this conclusion, although it must be admitted, it is' strongly favored by the surrounding circumstances. In the first place, it cannot be presumed that any one honored with a seat in the Legislature would be so corrupt as to knowingly and designedly attempt such a fraud and imposition; and secondly, that both the majority and minoi’ity were so ignorant, or careless, in the discharge of their duties, as not to know the powers they were conferring upon these new corporations by the adoption of the acts to which reference was made. The hypothesis assumed, that is, that a part of the lawmaking body were capable of an attempt to dupe and deceive their fellows, and that the latter could be thus imposed upon in .the discharge of the important trusts confided to them, by their constituents, would, *624 if established, be calculated to destroy all confidence in that most vital and important branch of the government.
No judicial action then, can be based upon a ground so derogatory to a co-ordinate department, and so destructive of all confidence in the representative system. It may also here be remarked, that there is no proof adduced of any extraneous facts to sustain the assumption upon which the argument is based. We need not, nor do we say now, whether a case could, or could not, be made out, which would authorize the Courts to disregard an act of the Assembly upon the ground of fraud and imposition in procuring its passage. This case does not in its facts call for a discussion or any opinion, on that question. *
2. It is insisted that the act chartering the plaintiff is invalid upon another ' ground, that Is, that the journals do not show that the ayes and noes were taken and recorded upon its final passage, as required by the Constitution, art. 2, sec. 21. The provision is that “ The ayes and noes shall be taken in each house on the final passage of every bill of a general character, and bills making appropriations of public moneys.” Whether this would be regarded as only directory *625 upon the members who were acting under an oath to support the Constitution, of which it is a part, or that it would be presumed that they had complied, and the clerk had failed to enter it upon the journal, it is not necessary to decide in this case, because this was not “ a bill of a general character.” That description was evidently intended to apply to such statutes as would affect the rights of the people at large, or all that might be embraced in a certain category, as all banks, all sheriffs, &c. Mayor and Ald. of Alexandria vs. Dearmon, 2 Sneed, 118, This was an act to create a private corporation, to bring into existence a new artificial person, and cannot in any legal sense be regarded as of a “general character.”
A more plausible constitutional objection, to say the least of it, might be made to this charter, if the fact be as assumed, that the section containing it was offered and adopted as an amendment on the third reading of the bill; grounded on the 18th sec.. of the 2d article of the Constitution. It is this:
“ Every bill shall be read once on three different days, and be passed each time in the House where it originated, before transmission to the other. No *626 bill shall become a law, until it shall be read and passed on three different days in each House, and signed by the respective Speakers.”
The intention of this requirement is, to ensure full consideration and mature reflection upon every measure before them, and that no bill shall be hastily and inconsiderately passed. If this mode had been adopted in a case like the present, the time intervening •, between the different readings, and .the repeated readings of the bill, would probably have caused some one to think of turning to the act of 1843, and bringing its contents before the House, if indeed the fact were as stated, that this was not done, nor its contents known to the members, that is, that they were voting in the dark, and in utter ignorance of what kind of law they were making. We have already said that we are forbidden by our respect for that honorable body to arrive at a conclusion so disparaging to them. Yet it is certain that conformity to the Constitution, in this respect, would tend to prevent such an occurrence as that presented in the argument. It is said that it is not unfrequently the case, and that the fact was so, in this instance, that provisions entirely distinct from those in a bill will be thrown on under the name of amendments on the third and last reading in both houses, and sent to the House where the bill *627 -originated for concurrence, when a favorable action will make it, as well as the original bill, the law of the land. Now, this has the appearance at least of an evasion of the Constitution. If the new matter is not germane to that of the original bill, it would seem to be a new bill, although it may be called an amendment, and if so, should be read three times instead of once in each House.
But the case before us does not call for an adjudication of this question, and it is only referred to now as one of sufficient importance to be maturely •considered of by the Legislature and the profession. It is certainly a very unsafe and improvident mode of legislation, and not to be favored. How this question should be brought up, and what would be the decision upon it, is left for a case in which it may arise.
3. If the repealing act of the last session, ch. 113 sec. 16 is valid and effectual the preceding questions are of but little importance in the disposition of this case. That then, is the main question, and we will now consider it.
In England corporations are created by royal charter, and 'by act of Parliament. They may also exist by prescription there, which presupposes a creation in a lawful mode, that is, in that country, by charter from the King, or act of Parliament. In this country *628 they can only be created by the authority of the Legislature. Constitution of Term., art. 11, sec. 7; 2 Kent, 276. In the case of private corporations, they are regarded as contracts between the public and the corporators, and as such, cannot be changed or altered by either party without the consent of the other, —the “obligation- of the contract” eannot be “impaired,” without an infraction of the Constitution. Their corporate franchises, as well as property, are vested with the security of other private rights,- and are placed beyond the power of the Legislature. These principles are well established, and have not been questioned since, if indeed they ever were before, the great leading case of Dartmouth College vs. Woodward, 4 Wheaton, 518; 2 Kent, 306; Angel and Ames on Corp., ch. 22, sec. 767.
But we consider it equally clear that the Legislature may reserve the power to modify, amend, or repeal a charter.—2 Kent 306; Angel and Ames, ch. 22, sec. 737. This reservation then, becomes a part of the contract, and the charter is accepted with that as one of its terms or provisions. This exercise, therefore, of this power, to amend or repeal, is no infraction of the contract in such a case, but is in exact conformity to it. The right of the Legislature to insert this term in charters is not debateable at *629 this day. Vested rights must be strongly maintained by the Courts against the Legislatures and all other authorities. The safety of every man’s rights, of all kinds depends upon a firm adherence to this principle, -and the least departure from it would be just cause of alarm. But what are the rights of men or corporations and the rules of construing their contracts, must also be regulated by the rules of law. A can-tract of any kind with various provisions, must be taken as a whole, and all its terms are to have -equal vigor according to the meaning and intent of the parties.
But in order to reserve to the Legislature this ‘important power to repeal, impair, or alter, the rights and privileges conferred by a charter, which is considered a compact between the government and the individual corporators, such reservation must be made a part and parcel of the contract, that is, it must be contained in the act constituting the charter, or it is of no force; such reservation is efficacious, contained in the same act with the charter, and not otherwise.—2 Kent, 306-7.
In the unreported case of Hurt vs. Lebanon and Nashville Turnpike Company, decided by this Court several Terms since, perhaps in 1850 or 1851, this was settled. An amendment of the charter in that *630 case had been passed, and at a subsequent session repealed.. The company resisted the iorce of the repealing act upon the ground that it was unconstitutional, on the principle established in the Dai'tmouth College case. The Court so held, although at the same session of the amended charter a general clause was inserted in another and distinct act, reserving to the Legislature the power to amend or repeal all charters granted at that session. But not being a part of the amended charter, it was held not to apply to it. If this were not so, no one could safely deal upon the faith of charters, without exploring and fully understanding the whole legislation of the session, at least. But upon the principle settled there is no danger, as the whole compact must be contained in the same act plainly open to the inspection of all persons concerned.
All these principles then being well settled, nothing remains but to ascertain the facts in the case before us, and determine the result.
As before stated,, the charter of the plaintiff is contained in chapter 294 of the acts of 1853-4, §§ 72,. 73, 74 and 75. The title of the act has been given, and this corporation is called the “Southern Mining Company.” The act first incorporates the “ J3tna Mining and Manufacturing Company,” then makes an *631 amendment of the “ Memphis and Charleston Railroad Company” in the sixth and seventh sections. Then from the seventh to the forty-ninth section, provision is made for the creation of any number' of corporations, for manufacturing purposes, by the association of four or more persons, upon the condition of making out a certain description of certificate, and having the same recorded by the clerk of the County Court. Whether such a corporation would be valid or not, is not the question in this case, and should therefore be left open for a case that may properly present it. But in the third clause of section eight, there is a proviso, that “the Legislature may, at pleasure, dissolve any company created by virtue of this act.” Again, in the forty-sixth section, it is enacted, “That the provisions of the act may be amended or repealed at the pleasure of the Legislature, and every company created under this act, shall be bound by such amendment:” The following sections create various other corporations by name, and then concludes with the one under consideration. This charter having been transferred by the first corporators after the organization of a regular bank, by virtue of the reference to, and adoption of, the charter of the Bank of East Tennessee, as before explained, is now, or was up to the repealing act of last session of the Legislature, *632 exercising all the functions of a bank, under the name of the “Miners’ and Manufacturers’ Bank,” in lieu of the “ Southern Mining Company,” the charter name of the corporation. It has no connection with the mining business, the apparent object of its creation. Another bank was established at Nashville, called the “ Central Bank,” under section sixty-eight of this act, incorporating “Eastern Division Mining Company.” This change of the names was authorized by the a«t. Both these charters were expressly repealed so far as they confer banking privileges by an act of the last session, ch. 113, § 16.
And it will at once be seen that the only question remaining is, whether according to the principles we have stated, the power of repeal was effectually reserved.
It is argued that it was not, because the clauses cited have reference only to the corporations to be created by certificate, under the eighth and succeeding sections. But the language is too broad for that construction, and cannot be so restricted. “Any company created by virtue of this act,” or, as in the forty-sixth section, “any company created under this act,” must, by all rules of fair construction, be extended to all and every section of the act, and not limited to a part of it. The location of the provision of itself, in the beginning, middle, or end of the chapter, *633 cannot impair its force and effect. But it might further be remarked, in answer to the objection, if it had only been intended to apply this provision to the countless certificate corporations provided for, as that had been fairly accomplished in the eighth section, why was it again repeated in the forty-sixth? We must take the Legislature to have meant what they plainly say, that the power to repeal was reserved as to all the companies charted under and by that act.
And. we further hold, that when one act contains charters for various companies, it is enough for the power of repeal to be reserved in any part of the-same act, without being repeated in each section which may contain a separate charter, provided the language of the clause is sufficient to embrace the whole act, and there is nothing to restrict it, as in this case.
So, we think, that the repealing power was properly and legally exercised, and puts an end to the banking powers of these corporations.
But the corporations, as well as the public, are saved from the general consequences of the dissolution of a corporation, by another provision in the same act. The forty-second section provides, “ That all corporations created under the provisions of this act, which shall expire by their own limitation, or shall be annulled by the Legislature, or otherwise, shall be *634 continued bodies corporate three' years after the time when they would have been so dissolved, for the purpose of prosecuting and defending suits,” &c. This section, as well as those on the subject of repeal, extends to, and constitutes a part of the charter of each and every company created by the act.
It follows, that the recovery of the plaintiff as a corporation was properly had, although its charter was repealed, as the suit was brought within the three yeai’s allowed to settle up the business of the concern.
The judgment is affirmed.

Note by Repobter.—This question was muck considered in the case of Fletcher vs. Peck, 6 Cranch. R., 87. That was an action of covenant upon a title deed, in the Circuit Court of the district of Massachusetts. Fletcher had purchased of Peck, on the 14th of May, 1803, a large body of land, paid the consideration money, and taken a deed from the latter. The land had been originally granted by the legislature of Georgia, and Peck claimed under a regular chain of conveyances from the original grantees. The act of Assembly authorizing the grant, was passed on the 7th of January, 1795, and the grant was issued by the Governor on the 13th of that month. On *625 the 13til of February, 1796, the Legislature of Georgia on account of certain improper influences used in order to procure the grant aforesaid, declared said grant null and void.
Among the covenants of Feck’s deed to Fletcher, was one “that all the title which the State of Georgia ever had in the premises, had been legally conveyed to John Peck, the grantor.” The second count of the declaration assigns as a breach of this covenant, “That the original grantees from the State of Georgia, promised and assured divers members of the Legislature, then sitting in General Assembly, that if the said members would assent to,. *626 and vote for, the passing of the act, and if the said bill should pass, such members should have a share of, and be interested in, all the lands purchased from said State by virtue of such lav. And that divers of the said members, to whom the said promises were made, were unduly influenced thereby, and, under such influence did vote for the passing of the said bill; by reason •whereof the said law was a nullity, &c., and so the title of the State of Georgia did not pass to said Peck,” &c.
*627 Chief Justice Marshal in animadverting upon this question as presented by the pleadings, holds the following language:
“That corruption should find its way into the governments of our infant republics, and contaminate the very source of legislation, or that impure motives should contribute to the passage of a law, or the formation of a legislative contract, are circumstances most deeply to be deplored. How far a Court of Justice would, in any case be competent, on proceedings instituted *628 by the State itself, to vacate a contract thus formed, and to annul rights acquired under that contract by third persons, having no notice of the improper means, by -which it -was obtained, is a question -which the Court ■would approach with much circumspection. It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements operating on members of the supreme sovereign power of a State, to the formation of a contract by that power, are examinable *629 in a Court of Justice. If the principle he conceded thatan act of the supreme sovereign power might be declared null by a Court, in consequence ■of the means which procured it, still there would be much difficulty in-saying to what extent those means must be applied to produce this effect. Must it 'be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of members? would the act be 'null, whatever might be the *630 ■wish of the nation, or would its obligation or nullity depend upon, the public-sentiment?
“If a majority of the Legislature be corrupt, it may well be doubted whether it be within the province of the judiciary to control their conduct - and if less than a majority act from impure motives, the principle by which, judicial-interference would be regulated is not clearly discerned.
“whatever difficulties this- subject might present, when viewed under *631 aspects of which it may he susceptible, this Court can perceive none in the particular pleadings now under consideration. This is not a bill brought by the State of Georgia to annul the contract; nor does it appear to the Court, by this count, that the State of Georgia is dissatisfied with the sale that has been made. This case as made out in the pleadings is simply this: One individual, who holds lands in the State of Georgia under a deed covenanting that the title of Georgia was in the grantor, brings an action of covenant *632 upon this deed, and assigns as a breach that some of the members of the Legislature were induced to vote in favor of the law -which constituted the contract, by being promised an interest in it, and that therefore the act is a mere nullity.
“This solemn question cannot be brought thus collaterally and incidentally before the Court. It would be indecent in the extreme, upon a private contract, between two individuals, to enter into an inquiry respecting the *633 corruption of the sovereign power of a State. If the title be plainly deduced from a legislative act, which the Legislature might constitutionally pass; if the act be clothed with all the requisite forms of a law, a Court, sitting as a Court of Law, cannot sustain a suit brought by one individual against another, founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the Legislature which passed the law.”